PRICE'S HEIRS, Respondents, v. EVANS, *et al.*, Appellants.*

1. The rule that a purchase of an adverse title by a trustee, mortgagee, or tenant for life, enures to the benefit of the *cestui que trust,* mortgagor or remainder man, is not applicable to cases, where there is no title whatever in the *cestui que trust,* &c., and the trustee, mortgagee, or tenant for life, not being in possession, is guilty of no fraud or unfair dealing, and derives no unjust advantage from the relation he sustains to the *cestui que trust.*

2. Where the title to which a trust or mortgage attaches fails absolutely, the trustee or mortgagee—in the absence of fraud and unfair dealing, or unfair

* RICHARDSON, Judge, having been of counsel, did not sit at the hearing of this case.

advantage arising out of the relation sustained to the *cestui que trust* or mortgagor—may purchase and hold for his own benefit an adverse title.

3. A judgment was rendered in the year 1829, in favor of one A. B. against one C. D. An execution was duly issued, and certain real estate of C. D. was seized and sold, and A. B. became the purchaser and received the sheriff's deed therefor. A second execution was duly issued, and a levy was made upon certain other real estate of C. D. On the day of the sheriff's sale under this execution, the plaintiff in the execution, A. B., executed and delivered to C. D. the following instrument in writing : " The understanding between C. D. and myself is that on the payment of my debt due me from said C. D. I am to reconvey all the property already purchased at sheriff's sale, and am also to purchase in the property to be sold this day by the sheriff, which is also to be reconveyed to C. D. on the payment and full satisfaction of my debt due as aforesaid. March 31, 1851. [Signed] A. B." A. B., in pursuance of said agreement, did purchase in the various tracts of land advertised to be sold. *Held*—under all the circumstances of the case, the lapse of time, the acts of the parties, the insolvency of C. D. from before the date of these transactions until his death in 1846 or 1847, the issuing with the knowledge of C. D. of other executions and the levying of them upon other lands of C. D., the little value of the lands purchased at the dates of the levies and sales, the fact that they were largely encumbered and were held for the most part under adversary titles—that the above agreement should be regarded in the light of a mere temporary privilege or indulgence granted to C. D. by A. B. ; that A. B. could not be regarded as holding the lands, purchased in by him under said agreement, by way of mortgage.

## *Appeal from St. Louis Circuit Court.*

This was a bill in chancery filed in the year 1845 by Risdon H. Price against Augustus H. Evans. The heirs of said Price were afterwards made complainants, and certain purchasers from Price were also made defendants. The bill, as amended, charges substantially that on the 28th of August, 1824, Risdon H. Price, sr., made and delivered to A. H. Evans a sealed note for $2089.64, payable one day after date ; that though said Evans acknowledged by a writing under seal, [see below opinion of court] dated April 19, 1828, that he held a certain tract of 640 acres, located in virtue of New Madrid certificate No. 399 (the Robertson tract) as a security for the amount due upon said note, and also acknowledged in said sealed writing that some payments had been made on said note, he yet, notwithstanding this, instituted suit against

Price on said note, and, not allowing any credits, obtained a judgment against Price, August 4th, 1829, for $2,089.64 debt, and $397.35 damages and costs—$2486.99; that, still allowing no credits, said Evans, between the date of said judgment and the year 1833, caused various executions to be issued and levied on a large amount of valuable property belonging to said Price, all of which was purchased at the several sheriff's sales by said Evans, either directly or by agent; that, for the purpose of quieting Price and obtaining his valuable property at a merely nominal price, Evans agreed with said R. H. Price that all the purchases he might make at such sheriff's sales of Price's property under process issued under said judgment should be held by him merely as a security for his debt and judgment aforesaid; that to put this beyond dispute Evans executed and delivered to said Price the following agreement in writing, to-wit: "The understanding between Risdon H. Price and myself is that on the payment of my debt due me from said R. H. Price, I am to reconvey all the property already purchased at sheriff's sale, and am also to purchase in the property to be sold this day by the sheriff, which is also to be reconveyed to Price on the payment and full satisfaction of my debt due as aforasaid. March 31, 1831. [Signed] A. H. Evans;" that from this it will appear that all purchases of property made by Evans under process issued on his debt and judgment, whether purchased on the 31st of March aforesaid or before that time, were expressly and solely made and to be made by said Evans and held by him as a security for said debt and judgment, and for the benefit of said Price entirely when said debt or judgment should be discharged.

The bill then proceeds to set forth the issuing of various executions under the judgment against Price, and the sheriff's sales thereunder; also the purchases by Evans at said sales, either directly or through his agent and attorney; also that said sales were made at enormous sacrifices, and at a ruinous loss to said Price; also that, "for a long series of years before his death, said Price was greatly afflicted both in

body and mind, and by reason thereof incapacitated to give any proper attention to his business, and so to watch and to exert himself as to supervise and counteract the frauds, infidelities and shocking spoliations practiced upon him by said Evans, who has, from the time of acquiring the 640 acres of land and New Madrid location in the year 1828, and before the rendition of said judgment against said Price, continued to avail himself of the inert, helpless and defenceless condition of said Price, to practice the most atrocious frauds and spoliations upon him and his property, and still perseveres in his iniquitous conduct by refusing all settlement and satisfaction," &c.; that as far back as the year 1832 said Evans had been fully paid the debt due him from Price. Complainants pray for an account of the original debt and of the rents and profits received, and for a decree vesting in them the title to the lands; also that any sum found due to complainants may be decreed to them; also for such other and further relief, &c.

The court rendered the following decree: "This cause coming on for further proceedings therein, the parties being present by their respective counsel, and due deliberation being had therein, and forasmuch as it appears to the court that on the 4th day of August, in the year 1829, as alleged in complainants' bill, the said defendant, Augustus H. Evans, recovered in this court a judgment for two thousand five hundred and eighty-six dollars and ninety-nine cents against Risdon H. Price, sr., since deceased; and forasmuch as it appears that the said Augustus H. Evans, at two several sheriff's sales on executions under said judgment — which said sales took place respectively as alleged in complainants' bill, on the 30th day of July, in the year eighteen hundred and thirty, and on the 31st day of March, in the year 1831—purchased in certain tracts and lots of land belonging to the said Risdon H. Price, sr.—which said tracts and lots of land are all those embraced in the two sheriff's deeds to said Augustus H. Evans, the one dated the 5th of August, in the year 1830, and recorded in the recorder's office of St. Louis county, in book Q, page 240, the other not dated, but acknow-

ledged April 23d, 1831, and recorded in the same office in book R, p. 66—under an understanding and agreement with the said Risdon H. Price, sr., that he, the said Augustus H. Evans, should hold the tracts and lots of land, so purchased in by him, in trust as a security for the payment of said judgment debt, and should reconvey the same to the said Risdon H. Price, upon payment of the said judgment debt to him the said Evans; and forasmuch as it appears to the court, and the court so declares the facts to be, that the said tracts and lots of land so purchased in by the said Evans (excepting a tract of 640 acres located in virtue of New Madrid certificate No. 399, issued to Andrew Robertson, or his legal representatives, as to which, under the facts of the case, the court adjudges and declares that the trust sought to be enforced by the complainants does not in equity attach) were, until the payment of the said judgment debt, in the manner stated below, held merely as a security for the payment of the said judgment; and forasmuch as it appears from the report of the commissioner appointed by the court to take an account in this cause, as the same has been corrected, amended, and reformed by this court, after due consideration thereof, that the said judgment debt—by the purchase, at sheriff's sales other than the two sheriff's sales above mentioned, of other lands belonging to the said Risdon H. Price, sr., by the proceeds received by the said Evans of sales of various portions of the tracts and lots of land so acquired and held as a security as above declared and sold and conveyed away by the said Evans, and by the receipt of the said Evans of the rents and profits arising from the said tracts and lots of land, and in other ways—has long since been paid to the said Augustus H. Evans; and forasmuch as it appears—after making all just allowances to the said Augustus H. Evans, for all his expenditures concerning the said tracts and lots of land, so as above acquired and held as a security, in paying taxes on the same, and in paying costs and counsel fees in suits in respect thereof, and in purchasing in and extinguishing outstanding claims, and for his services in attending upon, man-

aging and controlling the same—that there is a balance upon the whole account against the said Augustus H. Evans, and in favor of the complainants who are the children and heirs at law of the said Risdon H. Price. sr., deceased, which said balance amounts to the sum of five thousand nine hundred and five dollars and sixty-seven cents;—therefore it is ordered, adjudged, declared, and decreed, that the said Augustus H. Evans now holds all the right, title and interest which may now be in him, the said Evans, in and to all the several tracts and lots of land so acquired as above stated, and formerly held as above stated and declared as a security for the payment of the said judgment debt, absolutely in trust for the said complainants, the children and heirs at law of Risdon H. Price, sr., deceased; and it is further ordered, adjudged and decreed, that all the right, title and interest of the said Augustus H. Evans in and to the various tracts and lots of land so declared and decreed to be held absolutely in trust for the complainants as the children and heirs at law of the said Risdon H. Price, sr., deceased—and more particularly all the right, title and interest of the said Evans in and to all that lot or piece of land in the city of St. Louis, being the south half of the south-east quarter of block 57, in the said city, and bounded east by Second street, and south by Myrtle street, which said lot or piece of ground is described in the sheriff's deed to said Evans, above referred to as being sixty feet front (French measure) on Second or Church street, and one hundred and fifty feet on Myrtle street—be and the same are accordingly hereby devested out of the said Augustus H. Evans, and vested in the complainants, Risdon H. Price, Frederick Price, James Price, Martha House (late Price) wife of Samuel House, Anne Price, wife of John O. Price, and Eliza Price, to the end and intent that the said complainants have and hold the said tracts and lots of land free and clear of all claim and pretence of claim on the part of the said Augustus H. Evans, to them and their heirs forever, in fee simple. And it is further ordered that a writ of possession issue in favor of the said complainants, to put them,

the said complainants, in possession of the said lot or piece of ground, being the south half of the south-east quarter of block 57 in said city of St. Louis, and situated at the corner of Second and Myrtle streets. And it is further ordered, adjudged and decreed, that the complainants do recover of the said Augustus H. Evans the said sum of five thousand nine hundred and five dollars and sixty-seven cents, the same being the true balance against the said Evans upon the whole account taken in this cause. And it is further ordered and adjudged that the complainants do recover their costs in this cause against the said Evans, and have their writ of execution for the said debt and costs."

The bill at the hearing was dismissed as to the assignees of Evans. Appeals to this court were taken by the defendant Evans, and also by complainants.

It is deemed unnecessary to set forth the facts more fully ; they sufficiently appear in the opinion of the court.

*Shepley, Biddlecome* and *Johnson,* for Augustus H. Evans.

*S. T. Glover, Buckner* and *H. M. Jones,* for Price's heirs.

*Cline & Jamison* and *Wickham & Sneed,* for assignees of Evans.

NAPTON, Judge, delivered the opinion of the court.

This case is a complicated one, but its determination will depend chiefly upon the decision of two principal points. The first relates to the decree of the court dismissing the bill as to the tract of 640 acres located under New Madrid certificate 399. The second involves the construction of agreement marked " B," and the conduct of Evans in reference thereto.

The title to the 640 acres located by virtue of New Madrid certificate 399, and known also as the Robertson tract, is controlled mainly by an agreement executed by Evans on the 19th of April, 1828, and marked in the record as exhibit " A," considered in connection with the bill, answer and evi-

dence touching this branch of the case. The agreement "B" may also, in one view, draw within its control the title to this tract; but as a matter of convenience I will first consider the question without reference to exhibit "B." The agreement of April, 1828, called exhibit "A," is as follows: "Whereas I am the owner of a certain sealed note, made by Risdon H. Price to me, dated 28th August, 1824, payable one day after date, for the sum of $2,089.65, with interest thereon at ten per cent. per annum, on which note some payments have been made: Now be it known that all the right, title or interest, owned or held by me in a certain tract of land located in virtue of New Madrid certificate 399, dated 11th August, 1818, for six hundred and forty acres of land, and my interest in said certificate, (which certificate was conveyed by James Tanner to Risdon H. Price, dated 19th August, 1819,) are held by me as security for the amount due me on said note, and that when said note shall be fully paid and satisfied, I will convey to said Price or his assigns the said certificate and location made thereunder, as far as I may be or have been interested in the same. In witness whereof, I have hereto set my hand and seal, this 19th day of April, 1828. [Signed] A. H. Evans, (seal.)"

The bill charges that in August, 1824, Price executed to Evans his note for $2,089.64, payable one day after date, with ten per cent. interest per annum until paid, and that to secure said debt, Price in 1828, conveyed to Evans 640 acres of land located by virtue of New Madrid certificate 399 and survey 2775, and that the agreement marked "A" was executed by Evans as evidence of this transaction.

The answer admits the execution of the agreement of April, 1828, called exhibit "A," but states that neither the defendant nor Price had any title to the New Madrid certificate 399, or the land located under it, called the Robertson tract, at the date of the execution of this agreement; that at this time the title was held adversely to both by persons from whom the defendant subsequently acquired it. The answer sets out the title which Price had at this time, and which it

was understood he conveyed to Evans. Price's title was ac-
quired (so the answer states) from one Tanner, who had ob-
tained it from one Roberts. This was in 1818. Afterwards
Price, ascertaining that he got no title from Tanner, recon-
veyed to Tanner in order that Tanner might bring suit
upon the covenants in Roberts' deed to him. The suit was
brought and Tanner obtained a judgment against Roberts; an
execution was issued and levied on the land, and under this
execution the defendant Evans bought it for forty-six dollars;
and this was all the claim he had when he signed agree-
ment "A." The reason for giving it was, as stated in
Evans' answer, that Price, as he obtained no title from Tan-
ner, had a claim on Tanner for the consideration money,
which Tanner acknowledged to the amount of $200, and it
was agreed between Tanner and Price that Tanner should
pay this to Evans, and Price, thinking that Evans had bought
something at the sale on Tanner's execution against Roberts
which might prove valuable, it was agreed between Price and
Evans that upon such payment by Tanner he (Evans) would
transfer to Price any such title when the note to Evans was
paid. Tanner, it is declared in the answer, never paid any
thing, and was wholly insolvent up to the time of his death;
nor did Price pay any thing. Evans then had an execution
levied on the said tract of 640 acres with a view to get rid of
any outstanding interest which Price may have been thought
to have under agreement "A."

The title which Evans afterwards procured is adverse to all
the claims of Roberts, Tanner and Price. That title is set
out in the answer and is as follows: In 1810 Andrew Robert-
son was the owner of land in New Madrid injured by earth-
quakes, and on the 20th of July, 1810, conveyed the injured
land to one Humphreys. In 1816 Humphreys conveyed to
Theodore Hunt, and Evans bought Hunt's title under a judg-
ment execution and sheriff's sale in 1830.

The answer moreover avers that at the time this paper
marked exhibit "A" was made, Price had given deeds of
trust upon this land to the Bank of Edwardsville, to secure

the payment of $10,000 to the bank; that in 1820 he executed another deed to McDonald and Ridgley, to secure a large amount of indebtedness which has never yet been paid; that in August, 1821, the land was levied on by execution and sold to James McGunnegle, and a deed made to said McGunnegle; that in 1823 the same tract was sold to Riddick, and afterwards Comegys and Perschouse, judgment creditors, redeemed it and procured a deed from the sheriff; that all these titles were outstanding at the date of the execution of the agreement called exhibit " A," and rendered the title utterly valueless.    The exhibits accompanying the answer show the various sales, deeds, &c., referred to.    The defendant relied upon a title adverse to and totally unconnected with Price's title, and further stated that the land was still in dispute.    No evidence was offered touching this branch of the case, and its decision must depend upon the bill, answer and exhibits.

It is frequently laid down in general terms that if a trustee, mortgagee or tenant for life purchases an adverse title, such purchase enures to the benefit of the *cestui que trust*, mortgagor or remainder man.    As a general proposition this may be sufficiently definite, but where the title of the *cestui que trust*, mortgagor or remainder man is destroyed, it is not true that the trustee, mortgagee or tenant for life may not acquire the real title, provided his condition and conduct are free from fraud.    If by reason of his position as trustee he has the possession, and in acquiring the adverse title he takes undue advantage of the *cestui que trust*, courts of equity have gone so far as to hold such acquisitions to be still controlled by the trust.    But in the absence of fraud and in the absence of possession, I have not seen any case where it has been held that such purchases shall enure to the benefit of the *cestui que trust*, where the *cestui que trust* has at the time of such acquisition no title.    One would suppose that the destruction of the title to which the trust related virtually destroyed the trust, and it is not easy to see why the trustee, his duty ceasing with the existence of the subject matter of

the trust, should not be at liberty to deal in reference to the property as well as any other person. To say that a new title shall be grafted on an old one which has no existence, is an anomaly in language. There must be some interest in the *cestui que trust*—something tangible to keep the trust alive, and on which the newly acquired title can be grafted. Whilst therefore the courts have seized upon very slight circumstances to keep the trust in existence—such as the possession of the trustee, his using the money of the *cestui que trust* in buying the adverse title, or any underhanded or unfair dealing on his part—they have at the same time admitted, where the title of the *cestui qae trust* is totally gone and no circumstance of fraud exists, the trustee may acquire for his own use the real title.

Such was declared to be the law in Lesley's case, decided in 1680. (Freeman, Ch. 59.) " A man is guardian or trustee for an infant to whom lands are descended or devised, but the title is, *re vera*, in a third person ; if the guardian or trustee buy in the title of this third person, this shall not be taken to be a trust for the infant ; for he is at liberty to purchase it as well as any body else, and so it was held in the case of Combes and Throckmorton, per Cancellar." This is declared by the learned annotator who publishes the reports to be a *dictum*, and unsupported by modern authorities ; but the cases cited by him exhibit no such contradiction, and, although the doctrine is laid down in a more unqualified manner than subsequent decisions will justify, yet the principle is correct, and is to be understood without reference to any of those circumstances of fraud or misconduct which it is admitted will keep the trust alive.

This principle, with its true modifications, is very clearly stated and illustrated by Lord Manners, in the case of Nesbitt v. Frederick, 1 Ball & Beatty, 42. That was a case of a mortgagee renewing a lease in his own name after the old lease was forfeited and he was not in possession and gave due notice to the mortgagor to redeem. " The principle to be extracted from all the authors," says the chancellor,

" amounts to this, that whenever a mortgagee, executor, trustee or tenant for life gets an advantage by either being in possession or *behind the back* of the party, mortgagor, *cestui que trust* or remainder man, he shall not retain the same for his own benefit, but hold it in trust. The new lease in any of these cases will be considered as a graft upon the old one." As the mortgagee in that case had given notice that he would not redeem, and did not, as the chancellor expressed it, go behind the back of the mortgagor, (which I take to be only a mild way of imputing fraud,) and was not in possession, the new lease was not held to be affected by the mortgage.

In conformity to this is the opinion of Sir William Grant, in Randall v. Russell, 3 Mer. 190. Mrs. Russell was, under her husband's will, a tenant, *durante viduitate*, of a lease from a college, which had expired during her husband's lifetime, but which he had continued to hold up to his death as tenant from year to year, with the privilege of renewing. Mrs. Russell renewed the lease for nineteen years, but the college selling the reversion to a private person, she bought the reversion, and a bill was filed by the devisees to have her declared a trustee for them as to this reversion, or to give them as against her the benefit of the nineteen years' lease. The court held that the purchase of the remainder could not, under the circumstances, enure to the benefit of the devisees, upon the principle that after the reversion passed from the college, it did not concern them whether Mrs. Russell or any other person had purchased. In other words, as her situation as lessee gave her no particular advantage over others in the purchase of the reversion, and that purchase did not in any way affect the interest of the devisees, she was not a trustee for the uses of the will so far as this purchase was concerned. The remarks of the master of the rolls will abundantly show the grounds of his opinion. " No case," he says, " was mentioned in which this sort of equity had been carried to such a length. The ground commonly stated on which the renewed lease becomes subject to the trusts of a will disposing of the original lease is, that the one is merely

an extension or continuation of the other. But the fee is a totally different subject, which the testator had it not in his contemplation to acquire or dispose of. Yet if Mrs. Russell had purchased from the college, it might be said that she had thereby intercepted and cut off the chance of future renewals, and consequently made use of her situation to prejudice the interests of those who stood behind her, and there might be some sort of equity in their claim to have the reversion considered as a substitution for those interests, although, as I have already said, I am not aware of any decision to that effect. But here the situation of the parties was altered by the act of the landlord without any intervention of the tenant for life. The college had aliened the property to an individual. The benefits attending the tenant-right of renewal with a public body are gone. A lease at a rack rent was all that was to be expected from the private proprietor. Mrs. Russell's purchase from the first vendee wrought no change whatever in the situation of those who had interests in the lease as a college lease. Before she bought, it had become a lease that must expire at the end of fourteen years. Whether Mr. Hull, who bought of the college the reversion, sold or kept the reversion, was a matter of indifference to them. It is not enough to say that Mrs. Russell's situation as tenant for life gave her the opportunity of making the purchase. They must go on and show *what right or interest of theirs* she acquired or defeated by making the purchase."

Where the *cestui que trust* can not be injured, by reason of his title being entirely gone, the purchase of the trustee can not and ought not to be held subject to the trust which is virtually extinguished by the destruction of its subject matter, unless the conduct of the trustee, or some advantage he acquires by reason of this relation, should warrant the courts in creating a new trust, or extending the old one so as to embrace the new title. This is the doctrine as stated by Chancellor Kent in Holridge v. Gillespie, 2 John. Ch. 33, who declared it very much in the same language employed by Lord Manners, in Nesbitt v. Frederick. " It is a general

principle," says C. Kent, " pervading the cases, that if a mort-
gagee, executor, trustee, tenant for life, &c., who has a lim-
ited interest, gets an advantage by being in possession or be-
hind the back of the party interested in the subject, or by
some contrivance in fraud, he shall not retain the same for
his own benefit, but hold it in trust."

Such is also the principle of Kentucky cases, where the
subject has frequently come up, some of which have been
cited in this case as being supposed to enunciate a different
doctrine. In McLanahan's heirs v. Henderson's heirs, 2 A.
K. Marsh. 388, the action of the court was in nowise incon-
sistent with this doctrine, as a very condensed statement of
the facts will show. McLanahan bought a preëmption and
settlement right from Wilcoxson, and agreed if he succeeded
in getting any land patented under this claim that Wilcox-
son should have one-half. Wilcoxson conveyed his interest
to Henderson. McLanahan succeeded in his entries, surveys
and patents. Part of the land however he lost by suit; part
he voluntarily relinquished to an interfering claimant, and
he also bought the interfering claim of one Keller. The court
held McLanahan responsible for the land he relinquished, and
that the *cestui que use*, or his assignee, Henderson, should
participate in the benefit of the purchase from Keller, upon
paying his share of the purchase money. Although so much
of this judgment as held McLanahan responsible for the part
he voluntarily relinquished would seem to be going very far,
unless his conduct in that matter showed such gross negli-
gence as amounted to fraud, yet the court did not carry the
responsibility of the trustee further than the cases warrant
in holding his purchase from Keller as for the benefit of the
*cestui que use*. McLanahan had a preëmption right and a
settlement right under which he had at least acquired posses-
sion, and as the purchase from Keller was made to *strengthen*
his title, it would properly enure to the benefit of Wilcoxson's
assignee, who was the equitable tenant in common with him.
In Pugh's heirs v. Bell's heirs, 1 J. J. Marsh. 399, it is merely
decided that a purchase by a trustee from the *cestui que*

*trust* will not be enforced in equity where the consideration is inadequate and the *cestui que trust* was ignorant of his rights—a principle too clear to be disputed. In Morrison's Exec'r v. Caldwell, 5 Monr. 435, it is incidentally said that a trustee was not permitted by law to do any thing to the prejudice of the *cestui que trust*, or to acquire titles to the trust estate, in his individual character, *to the injury of the trust.* Qualified as this opinion is stated, it is not perceived to be inconsistent with what we have previously stated to be the rule; although the remark happens to be a mere *dictum*, the trustee in that case having conveyed to the persons holding under the *cestui que trust.* The case of Bowling's heirs v. Dobbyn's Adm'r, 5 Dana, 434, is a full recognition of the general doctrine on this subject. In this case a tenant for life—in possession after ejectment against her and judgment, but before ouster—purchased the opposing title. This court concedes the principle that it was competent for a trustee, mortgagee or tenant for life, after recovery in ejectment, to abandon their claims and take shelter under the opposing title, *without waiting to be ejected by writ.* But the court ascertaining that the money used to effect the purchase was the money of the estate—that is, would ultimately go to the remainder man—held the purchase as enuring to the benefit of the person in remainder. The court intimate that *perhaps* in such cases, even where the tenant purchased with his own funds, if he was still in possession, a court of equity might treat the purchase as for the benefit of the estate, upon reimbursing the trustee for expenses, &c. But it is not suggested that where there is no possession a trustee would be debarred from buying a title, where that of his *cestui que trust* was entirely gone, and holding it to his own use.

In England most of the cases occurring in the books relative to this doctrine are cases of leases, and although, after the expiration of a lease, there may be no legal obligation on the landlord to renew to the tenant in possesion, it seems to have become an established practice to consider those who are in possession of lands for lives or years, as having an in-

terest beyond the subsisting term. This interest is regarded as a valuable one, especially in leases from the crown, the church, or some college or corporation. (Lee v. Vernon, 5 Parl. Cas. 14.) So in Kentucky the courts treat settlement rights, preëmption rights, &c., as conferring great advantages to the party in possession in procuring the title. It may be expected therefore that the most liberal extension would be given to the law in favor of tenants, *cestuis que trust*, &c., in these two classes of cases. How far such motives ought to operate in the case now under consideration it may not be important to inquire.

The agreement marked exhibit "A" may be considered as partaking of the nature of a mortgage. It is an acknowledgment by Evans that the title to New Madrid certificate 399, and the land located thereunder, was held by him as security for a note given by Price, and an agreement on his part that when this note was paid he would convey to Price this title. The language is, "I will convey to said Price or his assigns the said certificate and location made thereunder, as far as *I may be* or *have been* interested in the same." That the title referred to was the one procured by Price from Tanner is not declared in so many words in the agreement; but to ascertain what this title was we must have recourse to Evans' answer, there being no evidence on either side except the exhibits of Evans in support of his answer, and which the opposite party tendered as proof upon the trial. It seems from the answer that, at the date of this agreement, Price held no title at all to this New Madrid location. The title which he had bought of Tanner he had reconveyed to Tanner to enable Tanner to recover upon Roberts' covenants to him. This suit, it appears, was brought and a judgment recovered and an execution on this judgment levied on this land. Evans purchased at this execution Roberts' interest in the land, which it would seem from the very statement could not have been very valuable—Roberts being sued for want of title, and a judgment going against him on this very ground. It is obvious that this title was hardly worth the

forty-six dollars Evans gave for it or bid for it. However, Price being indebted to Evans and Tanner being indebted to Price, the latter desired that any thing which could be made out of Tanner's execution should go to Evans; and Price, conceiving, as Evans declares, that his title so bought at the sheriff's sale against Roberts might· be valuable, secured its re-conveyance to him when the debt should be paid.

This was the title which Evans held when he executed agreement " A," and which by that agreement he held in trust for Price. Did Evans' position as mortgagee of this title forbid him, upon equitable principles, from purchasing the real title, and will a court of equity decree a conveyance of the real title, if Evans is found to have it, to his *cestui que trust*, Price? Evans, it will be observed, did not get the possession of this six hundred and forty acres, located under New Madrid certificate 399, from Price, nor does it appear that he has ever yet obtained possession from any source. There was no connection whatever between the title, which Evans procured through Hunt and Robertson, with the title of Roberts or Tanner or Price; nor does it appear that the chain of title derived from Price furnished any clue whatever to a discovery of the title through Robertson. It would not seem that the title of Price furnished any aid or gave him any advantage in procuring the real title, if indeed he has a valid title now. There was no dealing " behind the back" of Price, so far as the bill, answer and evidence disclose. Price was not in a condition to speculate in new acquisitions of this character; he was not able to maintain those he already had. Under these circumstances we think the decree of the circuit court was correct in dismissing the bill as to New Madrid certificate No. 399, unless the subsequent agreement marked " B," and the conduct of Evans relating thereto, should be thought to affect the transaction; and this brings us to the second branch of the case, which involves the construction of this second agreement.

In 1831, about three years after the date of agreement marked exhibit " A," and after Evans had, under an execu-

tion against Price in 1830, purchased Price's title to some six or seven tracts of land or town property in St. Louis, and on the day when a second sale was about to take place, Evans gave to Price the following writing, called in the record exhibit " B :"

" The understanding between Risdon H. Price and myself is, that on the payment of my debt due me from said R. H. Price, I am to reconvey all the property already purchased at sheriff's sale, and am also to purchase in the property to be sold this day by the sheriff, which is also to be reconveyed to Price on the payment and full satisfaction of my debt due as aforesaid. March 31st, 1831. [Signed] A. H. Evans."

The question is whether this agreement created a trust on the part of Evans in relation to the property thus purchased at the sheriff's sale, and if so, whether the trust is still subsisting and obligatory, and whether this is such a trust as the courts will enforce under the circumstances disclosed by the bill, answer and proofs in the case. The answer of the defendant denies the existence of the trust, and denies that the paper was ever designed to create an indefinite trust or was any thing more than a temporary privilege to Price to take back the interest which Evans had acquired or might acquire in his lands upon the payment of his debt. The circumstances attending the execution of this paper and the motives which led to it are stated in the answer, as follows : The defendant had made one sale under his judgment against Price and was about to sell other lands or lots, when on the day of the sale he was accosted by Price with a proposition for a delay of a few days with an assurance that he was then negotiating for the money to pay off the judgment and would probably be able to raise the money. The defendant was anxious to get his money and did not want Price's property, but, as Price had frequently made similar promises before this, he was unwilling to incur the expense of re-advertising, and therefore, under the assurances of Price that he would soon raise the money, and with the belief that a few days would determine whether this would so turn out or not, he execu-

ted this agreement or instrument. No consideration was given for it, and no confidence or trust was designed by the defendant, but simply a short indulgence to Price to enable him to raise the money. Shortly afterwards, Evans states, Price informed him that his negotiation had failed, and that he could not raise the money ; and from this date until the time of filing the bill neither Price nor any person for him had ever claimed any rights under this agreement, or pretended that he was a trustee or mortgagee.

This is the account of the transaction in substance as given by Evans. The testimony shows that at the time of this transaction, and long before—as early as 1819 or 1820—and long after, Price was wholly insolvent and continued to be so up to his death in 1847. It also appears that at this time real estate in St. Louis and its vicinity was difficult to dispose of and commanded very low prices ; that lands, with undisputed titles, lying in the vicinity of the tracts purchased by Evans at these sales, could be bought at from three to ten dollars an acre, and would not command at forced sales under execution more than government price. From this time and up to the commencement of this action real estate appreciated in value to an almost unprecedented extent. Land, which in 1832 could not be sold when offered at fifteen dollars an arpent, was subsequently sold, as one witness stated, at three hundred dollars per arpent, and this, in the opinion of this witness, was an average specimen of the increased value of real property during the period referred to. There was also, as Mr. Walker, the sheriff, stated, a quantity of public land in this vicinity to be entered at the government price. It appears that in 1831, and after the execution of this paper, " B," Evans issued or had issued on his judgment other executions, and Evans states in his answer that the sales under them in 1831 and '32 were with the knowledge of Price.

It is stated in the answer, and indeed abundantly appears throughout the record, that out of the numerous titles to lands and lots which Evans bought under these execution sales, hardly one was an undisputed title ; that a large pro-

portion of them was totally worthless, and scarcely one of them not affected by outstanding encumbrances of some sort, or adverse claims; that in the investigation of these titles, paying off these encumbrances, and instituting and defending and conpromising suits, a vast amount of labor, research and pecuniary expenditure were necessarily incurred by Evans. These facts are stated in the answer, and are amply sustained by the proof.

In arriving at the proper construction of a written instrument, it is the object of courts of justice to ascertain the *intention* of the parties to it.   If the language is unequivocal and no facts are disclosed to control or modify it, there is no room for hesitation or doubt.   But as a written instrument means whatever the parties to it intend that it shall import, there is probably no safer guide to lead to its proper construction than the acts of the parties themselves.   It will not do to look at the action of one party only, but of both; and if their conduct will consist with one construction, and is totally irreconcilable with another, there ought to be no hesitation in preferring that which the parties themselves have acted on and adopted, notwithstanding a different construction would more naturally be given to the language in which the agreement is written.   It is proper therefore to read this agreement marked exhibit "B" by what law-writers usually term "the light of surrounding circumstances."   The homely adage that "actions speak louder than words" is just as applicable here as in the ordinary occurrences of daily life. The proposition we have to examine is, what was the meaning and intention of Evans and Price—the one in giving, and the other in receiving, the paper writing of March, 1831? We do not mean to place any stress upon Evans' answer in ascertaining what his intention and understanding was, because when a man is charged with fraud and breach of trust, he of course denies it, though he is sometimes unable to give a very plausible account of the transaction consistent with his denial.   We speak now of Evans' actions rather than his statements, and his statements only so far as they are beyond

dispute supported by uncontradicted testimony and corrobo-
rated by his own conduct. It may be safely asserted that
Evans did not execute this instrument with any view to ac-
quire by it any additional security to himself. He already
had a judgment lien upon all Price's real estate, and that
lien had already been enforced by execution sales, under
which he had purchased, and was about to be enforced upon
other lands, which Evans also proposed to purchase. Evans
was manifestly no better off in the way of security for his
debt after he had signed this paper than he was before. We
do not mean to say that any substantial pecuniary considera-
tion is necessary to sustain an executed trust, or that a court
would not enforce the performance of such a trust and com-
pel an account, although no obvious pecuniary consideration
induced the trustee to assume that character. This question
of consideration has been much discussed in this case, and
many adjudged cases have been cited in reference to it, but
in our view its determination is unnecessary. We are merely
referring to the want of consideration or benefit to Evans as
a fact plainly appearing on the face of the transaction, and as
it illustrates the intent and motives of Evans. If Evans then
intended by the execution of this instrument to assume the
management of Price's land titles, to investigate their strength
and weakness, to remove all encumbrances, and watch over
them through all the tedious and expensive litigation to which
he knew them to be destined, he at least undertook this
burden without any perceptible benefit to himself, and would
seem to have been of a singularly benevolent disposition.

But let us turn to Evans' subsequent conduct and see
whether there is in it any thing to lead to the inference that
Evans considered himself as holding Price's property under a
*quasi* mortgage or trust. In the course of the same year in
which this agreement was made, and in the year following,
additional executions were sued out by Evans and levied on
additional property of Price. Evans could not be ignorant of
the fact that Price was in possession of the paper writing he
had signed and handed to him in March, 1831. If he and

Price understood that paper to have been in the nature of a mortgage or trust, how can this conduct of Evans, in having fresh executions levied on Price's property, be accounted for ? True, it may be said that this was all done with the consent of Price, and with the understanding that the purchases were to be affected by the same trusts. Certainly, if the paper executed at the second sale was designed as an indefinite trust, it was a manifest breach of that trust to press the executions upon other property, unless it was understood that such purchases were also for Price's benefit. But this explanation is hardly consistent with the charges in the bill, which, so far from asserting Price's assent to the subsequent acquisitions of Evans, declares them to have been a fraud upon his rights under the contract between them, and prays the court to hold them subject to the same trust. Evans then, with a knowledge that Price had in his possession an agreement—which, upon the supposition that it was still in force and obligatory, was a virtual suspension of further executions and sales, unless such execution sales were at Price's instance and for his benefit—proceeds within a few months and has new executions levied manifestly for his own benefit and to secure the judgment debt. We think it useless to dwell on this feature of the case. The construction which Evans gave to paper " B" can hardly admit of doubt. He unequivocally denies all trust in his answer, and, if that be disregarded as valueless, his whole conduct from 1831 to the day of filing this bill shows that he never acted as a trustee, or considered himself as clothed with any such fiduciary relation to Price. Every circumstance attending the history of this transaction corroborates Evans' answer, so far as his own understanding of the matter is concerned. Evans did not consider, after the failure of Price to raise the money in the spring of 1831, that the written memorandum he gave Price had any further obligation on him. He acted on this opinion throughout; he so states in his answer, and his acts correspond with his statement. Indeed if Evans had thought and acted differently it would present a remarkable instance of the voluntary impo-

sition of immense labors and sacrifices of time and money for the benefit of another, such as we do not often meet with in human affairs.

It is a matter of no consequence however in what light Evans viewed this paper executed in 1831, if Price understood it to be a trust and its language would authorize such construction. In seeking to ascertain Price's understanding of this instrument, the first matter which strikes our attention is the total silence of Price for fourteen years. Living in the same town with Evans for some years after this transaction, and never at any time so far removed as not to have convenient access to him, we do not find, from the bill, the answer, or any testimony in the case, that Price ever mentioned this subject to Evans, from the month or year in which the paper was signed, during fourteen years, up to the day he filed his bill for a specific performance. We speak now of lapse of time, not in reference to its effect as a limitation, nor simply as an argument against a specific performance, weighty and persuasive as it is and must be in that point of view, but as a practical interpretation of the instrument given by Price himself. Is it credible that Price believed his neighbor to have in his control and under his management a large amount of his property, to which he was to be restored upon the payment of his debt, without ever mentioning the subject to that neighbor for fourteen years, without any investigation into the progress of its management, and with no inquisition into the results likely to be realized?

In this connection it is proper to recur to the levies upon Price's property, made in the summer of 1831 and in the following winter. Evans, we have seen, did not hesitate to sue out additional executions, notwithstanding the instrument of March, 1831; and Price, he asserts in his answer, was fully cognizant of the sales under them. Without attaching any particular weight to Evans' statement on this point, it could hardly consist with rational probabilities that Price could be otherwise than informed of executions and sales of his own property directly at his door. But there is no proof that

Price took any steps to prevent these sales. Could he not have applied to the court and restrained Evans from such abuses of process by a creditor who had already arranged his debt, secured it by a trust, and virtually debarred himself from the right to make additional levies upon his property? Evans however proceeds, and Price quietly submits. Considering the agreement of 1831 as a temporary privilege to Price, which, having failed in its design, had no longer any subsistence, the conduct of Price is consistent enough. But treating the agreement as a trust, a subsisting trust at the time of the third issue of executions, Price's submission to such imposition is wholly unaccountable.

The change in the value of the property from 1831, when this agreement " B" was executed by Evans, to 1845, when this bill was filed, is a circumstance entitled to great weight. Taken in connection with the long period of time which the plaintiff has suffered to lapse before bringing his claim to the notice of the defendant, it can not fail to influence the standing of the plaintiff in a court of equity. The change in the value of the titles, which Evans bought, is also a circumstance to be noticed. The testimony is clear that Evans has been engaged in long, tedious and expensive litigation concerning these titles since their first acquisition, and it seems that by suit or by compromises he has succeeded in making some of them available. The sales of some have been made to yield him the amount of principal and interest which Price owed him, and probably something more; and valuable portions of the property are still retained by him. But if his energy and perseverance have enabled him to save from the wreck—the *debris* as the counsel very well termed it—of an insolvent estate, some property, to which time and a general appreciation in the value of property and his labor have given their principal value, it would be subversive of all just notions of equity to permit Price, after a silence of fourteen years, to claim the benefit of a contract, which if ever binding was to all appearance treated as abandoned and discharged.

It can not be doubted that Evans' motive in giving Price

the instrument which is the basis of this proceeding was to hasten the procurement of his money. No reasonable man, we think, could have hesitated to prefer the three thousand dollars, which in this case was about the amount of the debt, to the chances of a profitable speculation in the litigated and encumbered titles which an execution against Price could reach. That amount of money in 1831, according to the testimony of all the witnesses, could have been readily invested in undisputed titles, which would have participated in all the advantages which change of times has conferred on the titles acquired from Price, without being attended with any of the labor and risk.

A point is made in this case, as stated in the bill of exceptions, which it is proper to notice, although no stress was laid upon it in the argument. An offer was made to prove that Price was *insane* in 1832, and perhaps afterwards, but the evidence was rejected by the court. The bill contained no such allegation. The original bill filed by Price in 1845, by way of apology for the want of a specific and detailed list of property charged to have been fraudulently obtained by Evans, states that the " complainant had been for many years greatly afflicted in body and mind, and had given little or no attention to his business." This, though somewhat amplified, is substantially the language of the amended bill. We do not consider this as an allegation of insanity. Such a fact, alleged and proved, would have a material influence on the case, but we have considered it throughout without reference to this proffered evidence.

The case of Hiester v. Maderia, 3 Watts & Serg. 384, is said to be very much such an one as the present, and it is cited in support of the decree of the circuit court. We can see but little resemblance in the cases in all the *essential* facts and circumstances that tend to illustrate and determine the true character of a transaction. Hiester and Maderia were partners in the purchase of nine tracts of land in the interior of Pennsylvania. The lands were valuable, as Maderia's share of the purchase money due would show, and the titles, it is to be

inferred, were beyond dispute. Maderia, being behindhand in paying up to Hiester his portion of the purchase money, a suit was brought against him and a judgment recovered and an execution levied on his interest in these tracts. Maderia attended the sheriff's sale with nine hundred dollars in his pocket to pay off the execution, supposing this sum to be sufficient. It turned out that about twelve hundred and fifty dollars were due. Hiester was also there, and as he did not himself know exactly the amount due on this execution, and the matter required some calculation, he received the nine hundred dollars, and he and Maderia executed a paper, the substance of which was that Hiester was to buy all the land at the sale, and upon Maderia's paying whatever was due on the judgment in three months, Hiester was to convey to Maderia his third part—the amount to which Maderia was entitled under the original agreement. Maderia died—when, it does not appear—but suit was brought by his heirs; and this paper, executed and signed by Hiester and Maderia, was held to be an equitable mortgage. Except that this was a transaction which occurred between creditor and debtor at an execution sale of the debtor's property, I see but little if any other resemblance between it and the case at bar. There could be no doubt of the equity of compelling Hiester to convey on payment of the small amount due. They were partners in the original purchase; the lands were of undoubted value and the titles beyond dispute. No laches occurred on the part of Maderia so far as the case shows. There could be no doubt of the meaning and intent of the parties to secure the payment of a small sum by an instrument in the nature of a mortgage; and time not being essential in a case of this kind, and no circumstance stated to show that it could have or did have any material influence upon the conduct of either party, and no change in the value of the land, so far as we can see from the report, occurring, we see no reason why the trust should not have been enforced. But there is nothing in the principles, which led to this conclusion, inconsistent with

those which have led us to a different conclusion in the present case.

Without referring particularly to any other of the many cases which have been cited and examined in this case, we pass to the conclusion, that in our judgment, considering all the circumstances attending the execution of this instrument of March 31st, 1831, and the conduct and situation of the parties in reference to it, both before and after its execution, we do not regard it as a mortgage or an indefinite trust, but at most a temporary privilege or confidence, designed by both parties for a temporary purpose, and failing in that purpose, abandoned and consigned to oblivion, having no influence whatever upon the conduct of either party in all their subsequent transactions.

The judgment of the circuit court will be reversed and the bill dismissed; Judge Scott concurring; Judge Richardson not sitting.